UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

EPHRAIM VANTERPOOL,

                              Plaintiff,

              -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:___ 4/22/2014

12-CV-08789 (VEC)(SN)

REPORT AND
RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE VALERIE E. CAPRONI:

        Plaintiff Ephraim Vanterpool, appearing *pro se*, brings this action pursuant to Section

205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the

final determination of the Commissioner of Social Security (the "Commissioner") denying his

application for Supplemental Security Income ("SSI") benefits. The Commissioner moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Vanterpool did not oppose the motion. Because I conclude that substantial evidence supports the

Commissioner's final determination, and because the administrative law judge ("ALJ") did not

commit legal error, I recommend that the Commissioner's motion be GRANTED.

PROCEDURAL BACKGROUND

        On February 12, 2010, Vanterpool submitted an application for SSI benefits. On March

16, 2010, the Social Security Administration (the "SSA") denied this application, and on April 5,

2010, Vanterpool appealed, requesting a hearing before an administrative law judge. Vanterpool

appeared with counsel before ALJ Zachary S. Weiss on April 1, 2011. The ALJ issued a decision on May 27, 2011, denying Vanterpool benefits. The Appeals Council denied Vanterpool's request for review of the ALJ's decision on October 19, 2012, thereby rendering the decision of the Commissioner final.

On December 3, 2012, Vanterpool filed this *pro se* action. On December 7, 2012, the Honorable Paul A. Crotty referred Vanterpool's case to my docket for a report and recommendation. On December 16, 2013, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On January 17, 2014, the Court issued an Order directing Vanterpool to file a response by January 31, 2014, otherwise the motion would be considered fully briefed. On March 11, 2014, the case was reassigned to the Honorable Valerie E. Caproni. Vanterpool did not file a response to the Commissioner's motion for judgment on the pleadings, and the motion is considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.     Non-Medical Evidence

Vanterpool is now thirty years old, lives with his parents, and has an eleventh grade education. From the beginning of 2007 until June 2007, Vanterpool worked as a home health aide.[1] In his application for benefits, Vanterpool stated that he needed help or a reminder to brush his teeth, clean, wash his clothes, or clean his room. He needed his mother to remind him to take his medication. Vanterpool prepared his own food weekly, and identified laziness as the

---

[1] There is some disagreement in the record as to whether Vanterpool worked in 2007 or in 2008. His earnings record supports a conclusion that his employment was in 2007. Because the dates of his previous employment are not within the relevant period for his disability claim and because the precise dates are not relevant to the ALJ's determination, the inconsistency need not be resolved.

reason he sometimes did not prepare his meals. He would sometimes go to the store to buy food. Vanterpool indicated that he could count change but was not able to pay bills, use a checkbook, or handle a savings account. He described himself as having no hobbies or interests, except watching movies or television, which he did every day.

On May 20, 2008, Vanterpool was terminated from the Adult Education and Training Program at Bronx Community College for threatening behavior towards another student. A letter from Bronx Community College indicated that Vanterpool had previously been warned about inappropriate classroom behavior.

## II.   Medical Evidence

### A.  North Central Bronx Hospital

Vanterpool was treated at North Central Bronx Hospital from December 16, 2007 to February 4, 2008. He was brought to the emergency room by his mother who believed he was exhibiting increased paranoia and impulsive behavior. Vanterpool had a history of drug abuse but had been sober for six years. He was diagnosed with psychosis, not otherwise specified and given a Global Assessment of Functioning ("GAF") of 35. [2]

Dr. Tasbeeh Fatima noted that Vanterpool was treated in the inpatient unit. He did not exhibit overt psychosis or delusional thinking, and his thoughts were goal oriented.  He was,

---

[2] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. rev. 2000)). A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas such as work, judgment, or mood. See http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited April 21, 2014). The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). The DSM IV, however, was in effect at the time of Vanterpool's treatment.

however, mostly isolated in his room. His affect was constricted and his mother reported that he

had called her from the facility and had an outburst over the phone. He denied any audiovisual

delusions or suicidal or homicidal ideation. His insight and judgment, however, were limited.

Vanterpool was started on Seroquel during his stay and was discharged from inpatient care on

January 2, 2008[3] in a stable condition. His GAF upon discharge was 67.[4]

### B.  Bronx-Lebanon Hospital Center

#### 1.  Contemporaneous Medical Records

Vanterpool received treatment at Bronx-Lebanon Hospital Center beginning in March

2008. Vanterpool's March 5, 2008 Comprehensive Treatment Plan indicates a diagnosis of

Schizophrenia, Chronic, Paranoid Type. The document also indicates that his GAF at the time

was 55, and his best GAF during the past year was 55.[5] The social worker noted that Vanterpool

was hospitalized in December 2007 and transitioned to partial hospitalization from January 3,

2008 to February 4, 2008.[6] This is the only evidence of hospitalization in the record. Vanterpool

met with his treating physician, Dr. Harneja, and a licensed clinical social worker approximately

once a month. His treatment at Bronx-Lebanon Hospital Center continued from 2008 to 2010,

with the last treatment record dated October 14, 2010.

---

[3] The date in the medical record is January 2, 2007. Given that he was admitted on December 17, 2007, the record appears to be inaccurate.

[4] A GAF score from 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning but generally the individual is functioning "pretty well." DSM–IV at 34.

[5] A GAF score from 60-51 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers).

[6] The Administrative Record contains no medical records during this period.

Between March 5, 2008 and October 3, 2009, the alleged onset date of Vanterpool's disability, he maintained regular appointments with both his treating physician and his social worker, though he missed appointments in August 2009 and September 2009. Vanterpool's GAF during this time ranged from 55 to 61. He consistently denied psychotic symptoms or hallucinations, and no delusions were exhibited. The medical records indicate that at times he was easily distracted and his affect was blunted or constricted. He was consistently well-dressed and cooperative, and his impulse control was fair or adequate. On June 2, 2008, and July 28, 2008, he was described as "clinically stable" with a GAF of 61. (R. 289, 300.)

On October 22, 2009, Vanterpool met with his social worker. His mood was euthymic (normal, non-depressed) and he was not paranoid, though he admitted non-compliance with his medication. The notes indicate that Vanterpool's mother informed the social worker that Vanterpool was acting strange and was paranoid about his food being poisoned and people being after him. His GAF was 55. His attitude and behavior were appropriate. He was alert and oriented, exhibited no thought or perceptual disorders, and his cognitive abilities and memory were intact. His insight, judgment, and impulse control were described as fair. The check-box indicating that his attention and concentration were normal, however, was left blank.

On October 24, 2009, Vanterpool saw Dr. Harneja, after failing to show up for his appointments for nearly three months. Vanterpool told Dr. Harneja that he had not taken any of his medications for nearly two months and he was doing okay. Vanterpool reported, however, that his mother told him that he needed to take his medication. Vanterpool informed the doctor that he did not want to get sick again or be hospitalized but he wanted a lower dosage of Seroquel, his prescribed medication. Dr. Harneja described Vanterpool as well-dressed and

cooperative, though his affect was constricted. Vanterpool denied having any hallucinations or suicidal or homicidal thoughts. Dr. Harneja described his impulse control as adequate.

Vanterpool saw his social worker again on November 20, 2009. He reported that he was fine: "I am now taking my medication. I have no stressors at home. Everything is good." (R. 363.) His mood was again described as euthymic, with no perceived psychosis. His speech was clear and he had good eye contact. He was oriented to time and place. His GAF was 55. The social worker observed no thought or perceptual disorders and his cognitive ability and memory appeared to be intact. The box next to normal attention and concentration was again left blank.

Vanterpool failed to keep his appointment with Dr. Harneja on November 23, 2009. He indicated that he still had medication left because he was not taking his medication regularly. Vanterpool kept his rescheduled appointment with Dr. Harneja on November 30, 2009. He told the doctor that he needed to see a counselor for his anger problem. He denied having psychological problems as well as any hallucinations or delusions. Vanterpool was only intermittently taking his medication. Dr. Harneja described him as well-dressed, calm, and cooperative, but he was easily distracted. His impulse control was adequate.

Vanterpool missed his scheduled appointment with the social worker on December 21, 2009. He was seen by Dr. Harneja on January 9, 2010, and reported that he was doing well, denying any audiovisual hallucinations, mood swings, or irritability. He reported that he still had medication left and the doctor reinforced the importance of compliance with his treatment plan. His GAF was 61. Vanterpool missed his rescheduled appointment with the social worker on January 18, 2010.

Vanterpool met with his social worker on February 5, 2010. He reported that he was taking his medications daily. His attitude and behavior were appropriate. He was alert and had

6

normal attention and concentration. His memory was intact, and he had no suicidal or homicidal thoughts. His insight, judgment and impulse control were all observed to be fair. He presented no paranoid thinking and his GAF was 60. On February 13, 2010, Vanterpool was seen by Dr. Harneja for medication management. He reported that he was taking his medication regularly though he still would forget some days. His GAF was 61-63, and his attention and concentration were normal.

From March 2010 through October 2010, Vanterpool visited Bronx-Lebanon Hospital Center on numerous occasions and indicated that he was doing fine, reporting no hallucinations or delusions. He was consistently taking his medication, denying audiovisual hallucinations, and demonstrating no paranoia. There were no indications in the medical records of deterioration from the prior assessments with regard to judgment, impulse control, insight, cognitive ability, memory, and attention. His GAF ranged from 55-63, with most GAFs above 60. Dr. Harneja described Vanterpool as clinically stable on multiple occasions. In April 2010, Vanterpool reported that he had one outburst of anger during the prior week but that he handled it. In July 2010, Vanterpool indicated that he was looking for a part time job but was not sure what he wanted to do. The record indicates that Vanterpool missed a few scheduled appointments during this period.

### 2. Medical Opinion Reports

On April 1, 2010, Dr. Harneja completed a medical assessment form pertaining to Vanterpool's ability to work. Dr. Harneja indicated that Vanterpool's ability to follow work rules and use judgment in an occupation was fair.[7] He identified his ability to relate to co-workers,

---

[7] The assessment form provides the following descriptions for each of the possible categories from which the physician may choose: "Unlimited or Very Good – Ability to function in this area is more than satisfactory. Good – Ability to function is this area is limited but satisfactory. Fair – Ability to function in

deal with the public, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration as poor/none. He also indicated that his ability to understand, remember, and carry out complex job instructions was poor to none, but his ability to carry out detailed (but not complex) or simple job instructions was fair. His ability to maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was fair. Dr. Harneja believed that Vanterpool would need his mother's assistance to help him manage his benefits.

On April 2, 2010, Vanterpool's social worker filled out a Social Security Disability psychiatric assessment form. Dr. Harneja approved the form. The social worker described Vanterpool as suffering from chronic paranoid schizophrenia, having periods of unstable mood where he was easily distracted, agitated, argumentative, and impulsive. She noted that though Vanterpool denied having auditory or visual hallucinations, he appeared to be responding to internal stimuli and was observed laughing inappropriately. She described his concentration as very poor and marked his GAF as 55-60. She indicated that he should be clinically stable if he continued with treatment.

On March 17, 2011, Dr. Harneja completed another medical assessment form pertaining to Vanterpool's ability to work. In this assessment, Vanterpool's ability to maintain attention and concentration had improved from poor/none to fair. In addition, Dr. Harneja added a note that the longest Vanterpool had worked was four to five months and indicated that in work related situations, Vanterpool was very paranoid. "He thinks people are talking about him and cameras are watching. He is very weary of his peers and cannot function around them in a normal

---

this area is seriously limited, but not precluded. Poor or None – No useful ability to function in this area."
(R. 253.)

8

manner." (R. 255.) Otherwise, this assessment was nearly identical to the 2010 assessment. On March 17, 2011, Vanterpool's social worker also completed another psychiatric form, signed by Dr. Harneja, and her responses were also essentially identical to those in the April 2, 2010 document. She did note that Vanterpool no longer laughed inappropriately and was not presenting any delusional thinking.

### B.    Dr. Dmitri Bougakov

On March 5, 2010, Dr. Dmitri Bougakov, Ph.D. evaluated Vanterpool at the Commissioner's request. During the evaluation, Vanterpool was well-groomed and cooperative. He was coherent and goal directed. His mood was neutral and he was oriented to person, place, and time. Dr. Bougakov described Vanterpool's attention and concentration as intact. His recent and remote memory skills were mildly impaired. Dr. Bougakov described Vanterpool's cognitive functioning as average to below-average and his general fund of information was somewhat limited. Vanterpool's insight was poor to fair and his judgment was fair.

Vanterpool reported to Dr. Bougakov that he was able to do all his chores by himself. He did not spend much time with friends but had a good relationship with his family. Vanterpool was able to manage money and take public transportation. He enjoyed watching TV, reading, and playing sports during the daytime.

Dr. Bougakov noted that Vanterpool did not present with significant vocational difficulties, though he had some mild difficulties in learning new tasks and performing complex tasks. These difficulties were related to his psychiatric symptoms. While the results of the examination were consistent with psychiatric problems, they did not appear significant enough to interfere with Vanterpool's ability to function on a daily basis. Dr. Bougakov recommended that Vanterpool continue with his treatment. He also noted that Vanterpool would benefit from

receiving a GED and vocational assistance. In light Vanterpool's limited insight and mild cognitive limitations, Dr. Bougakov determined that Vanterpool's prognosis was guarded. Vanterpool appeared to be psychiatrically stable.

### C.   Dr. T. Harding

On March 15, 2010, Dr. T. Harding, a state agency psychologist, evaluated the evidence of record. Dr. Harding noted a diagnosis of psychosis, not otherwise specified, that was supported by Vanterpool's symptoms, signs, and laboratory findings. Dr. Harding indicated that Vanterpool demonstrated mild limitations in his daily living activities and moderate limitation in social functioning as well as concentration, persistence, or pace. Vanterpool had also had one or two episodes of deterioration for an extended period. Dr. Harding indicated that the evidence did not establish the presence of a "C" criteria. After assessing Vanterpool's mental residual functional capacity, Dr. Harding concluded that Vanterpool had, at most, moderate limitations. He described Vanterpool's symptoms as "stable." (R. 239.) He concluded that Vanterpool would be capable of performing a job where he would have simple tasks.

## II.   The Administrative Hearing

### A.  Vanterpool's Testimony

Vanterpool appeared at the hearing on April 1, 2011, with counsel. The ALJ informed Vanterpool's counsel that he had received only physician opinions; no underlying treatment notes were provided. The ALJ explained the importance of the underlying treatment notes to his ability to assess the physician's opinion. The ALJ informed counsel that he would hold the record open for a week so that counsel could submit the underlying treatment records.

Vanterpool was 27 years old at the time of the hearing and lived with his mother and father. He testified that he usually stayed home and watched television, including cartoons. He

slept a lot and never went out with friends. He read the newspaper, specifically the Daily News. Vanterpool testified that his mother took care of the household needs, including the cooking and the laundry. Sometimes he would grocery shop for his mother. Vanterpool stated that he watched sports, but could only play baseball at the park for about five minutes because he had a "hot temper." (R. 46-47.) Vanterpool also fed his dog and sometimes took him for walks.

Vanterpool described feeling like people were coming around him and telling him he was not going to get his SSI checks and saying "disease words" to him. (R. 43-44.) This would especially happen if he was in an enclosed space, like a train or a bus. Vanterpool testified that he was kicked out of his GED class. During the classes he was nervous and kept hearing people say things like, "Oh, you gonna die." (R. 44.) He described himself as having paranoia.

Vanterpool testified that he worked as a home health aide in 2007, but stopped working there because he became uncomfortable around people and thought they were trying to kill him. He tried to go back to take classes again, but felt like he just couldn't do it. He didn't want to take the test again. He stated that he only worked part-time as a home health aid Monday through Friday. The ALJ told Vanterpool that the record indicated that Vanterpool had told someone that he worked in 2008 on the weekends. (Vanterpool denied telling anyone that.

Vanterpool had some difficulty remembering the specific doctors he had seen in recent years. He described telling some doctors that he was feeling paranoid but denied hearing voices. Vanterpool described that he was afraid they were going to put him on heavier medication, so he would not tell them "really heavy things." (R. 46.) He expressed concern about being put back in the hospital. Vanterpool testified that he had seen a counselor, Mrs. Morrison, at Bronx-Lebanon Hospital twice a week for over two years and that he saw his physician once a month for his

medication. He described that his medicine kept him "in like a zone," but that it did not really work to help him focus. (R. 48.) He would sometimes get angry.

Vanterpool testified that he would get into disagreements or arguments with people when they would stare at him or "stuff like that." (R. 51.) He described getting into a "little argument" a week prior to the hearing, because the person challenged him. (Id.) Initially it was just a verbal altercation, but then the individual charged Vanterpool, so he defended himself and held him to the floor. His arguments were usually with strangers. He described that individuals would tell him he was not going to get SSI or his GED. He would ask people, "What's your problem?" and they would act funny. (R. 52.) He hated that. This would happen to him frequently on the train. He asked his doctor if there was a cure, and his doctor told him the cure was to keep seeing his social worker.

Vanterpool testified that he felt as if he did not know if he was going to make it in life. "The way things go on in life, like I can't get nothing in life. I try hard to get a GED, I try hard – I need some money to survive. It's hard, it's like it's not working out. It's not easy." (R. 54.) Vanterpool described walking a lot in the day. He found it peaceful and felt "free" and "safe." (R. 55.)

The ALJ asked Vanterpool some questions regarding his prior work as a home health aide. Vanterpool could not remember the name of the specific home health aide service, but believed it was Active Home Health Aide. He stated that he had training to become an aide, including schoolwork, but that he had difficulties in doing the schoolwork and preparing for the test. He did, however, manage to pass the test. He described himself as getting lucky because usually he failed. Vanterpool informed the ALJ that you need to be licensed to be a home health aide and he did have a license.

12

### B. Vocational Expert Testimony

Andrew Vaughn, a vocational expert, testified at the hearing. He reviewed the evidence in the record and testified that Vanterpool had work experience as a home health aide. The ALJ first asked the vocational expert to assume an individual of Vanterpool's age, educational background, and work experience who was limited to routine repetitive tasks. The ALJ asked whether such a person would be able to do Vanterpool's past relevant work. The vocational expert testified that Vanterpool would be able to perform his past work. The ALJ then proceeded to ask the vocational expert to identify available jobs for an individual of Vanterpool's age, education, and prior work experience, who was limited to simple, routine, repetitive jobs without exertional limitations. The vocational expert identified three light exertional jobs that would qualify: a mail room or postal clerk (with 131,750 jobs in the national economy and 7,000 in the regional economy), a courier (with 93,000 jobs in the national economy and 7,300 in the regional economy), and a cafeteria attendant (402,000 jobs in the national economy and 14,100 in the regional economy).

The ALJ then asked the vocational expert to keep the previous criteria but add in that the individual could have little to no interaction with coworkers. The vocational expert testified that such a person would still be able to work as a courier or a mail room clerk. The vocational expert also identified laundry worker, which had 887,000 jobs in the national economy and 29,690 in the regional economy, as satisfying the limitations set forth by the judge. The ALJ asked the vocational expert to consider that the person also needed to have limited or no interaction with the public. After clarifying that "public interaction" meant not performing his tasks while a lot of people were around, the vocational expert identified the jobs of mail room clerk, laundry worker,

and motel cleaner as possible occupations for such an individual. There were 807,000 motel

cleaning jobs in the national economy and 99,690 in the regional economy.

The next element that the ALJ asked the vocational expert to consider was an occupation

with all the prior criteria that also required little judgment. The vocational expert testified that a

mail room clerk, laundry worker, and courier all would satisfy those criteria. The ALJ then asked

the vocational expert if any of the identified jobs would be ruled out if the individual was "off

task" ten percent of the time. The vocational expert testified that only the occupation of courier

would survive such a limitation. When asked what jobs would remain if an individual were "off

task" 20 percent of the time, the vocational expert stated that such an individual would be

disqualified from all the identified jobs. The ALJ asked the vocational expert to consider a final

limitation: a person who suffers from paranoia, believing that people were talking about him,

which leads to unpredictable behavior, including getting into fights. The vocational expert stated

that none of the jobs would survive that limitation.

On May 27, 2011, the ALJ issued his decision denying Vanterpool's claim for SSI, and

on October 19, 2012, the Appeals Council denied Vanterpool's request for review, thereby

rendering the decision of the Commissioner final.

## DISCUSSION

## I.    Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but

early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if,

from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v.

Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted). In reviewing a

decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise" (citation and internal quotation marks omitted; emphasis in original)).

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523(KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701(NRB), 2010 WL 4159383, at *2 n. 4 (S.D.N.Y. Oct.

20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d

Cir.2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion,

even if unopposed, and determine from what it has before it whether the moving party is entitled

to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

  *Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore,

their complaints "should be read to raise the strongest arguments that they suggest." Green v.

United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see

Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005)

(articulating liberal *pro se* standard in reviewing denial of disability benefits).

## II. Definition of Disability

  A claimant is disabled under the Act if he demonstrates an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A

determinable physical or mental impairment is defined as one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be

determined to be disabled only if the impairment(s) are "of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy . . . ."

42 U.S.C. § 423(d)(2)(A).

  Under the authority of the Act, the Social Security Administration has established a five-

step sequential evaluation process when making disability determinations. See 20 C.F.R. §

416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education and past relevant work experience. 20 C.F.R. § 416.960(c)(2); Melville, 198 F.3d at 51.

Title 20 C.F.R. § 416.920a provides additional information to guide evaluations of mental impairments. Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 416.920a(c)(1),(2). The main areas that are assessed are activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation; each is rated on a five-point scale.  20 C.F.R. § 416.920a(c)(3)-(4). If an impairment is given the rating of

"severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed

mental disorder.  20 C.F.R. § 416.920a(d)(2).

A mental disorder such, as schizophrenia, will qualify as a "listed impairment" if there is

medically documented persistence, either continuous or intermittent, of delusions, hallucinations,

disorganized behavior, incoherence, illogical thinking, blunt or flat affect, or emotional

withdrawal, etc., resulting in at least two of the following: (1) marked restriction of activities of

daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation,

each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.03(A), 12.03(B) (so

called "B paragraph criteria").  If the mental disorder does not qualify as a listed impairment

under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic schizophrenic, paranoid, or other
> psychotic disorder of at least 2 years' duration that has caused more than a
> minimal limitation of ability to do basic work activities, with symptoms or signs
> currently attenuated by medication or psychosocial support, and one of the
> following: [r]epeated episodes of decompensation, each of extended duration; or a
> [r]esidual disease process that has resulted in such marginal adjustment that even
> a minimal increase in mental demands or change in the environment would be
> predicted to cause the individual to decompensate; or [c]urrent history of 1 or
> more years' inability to function outside a highly supportive living arrangement,
> with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(C) (so called "C paragraph criteria").

## III.    Analysis of the ALJ's Determination

On May 27, 2011, after evaluating Vanterpool's claims pursuant to the sequential

evaluation process, the ALJ issued a decision finding that Vanterpool was not disabled within

the meaning of the Social Security Act from the date his application was filed, February 10,

2010. (R. 17-27.) At step one, the ALJ determined that Vanterpool had not been engaged in

"substantial gainful activity" ("SGA"). (R. 19.) At step two, the ALJ found that Vanterpool's

paranoid schizophrenia was a severe impairment. (Id.) At step three, the ALJ found that

Vanterpool's impairment, however, did not meet or medically equal any of the listed

impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) The ALJ determined

that Vanterpool had the residual functional capacity to perform a full range of work at all

exertional levels but had non-exertional limitations due to his mental impairment. [8] These non-

exertional limitations restricted him to routine, repetitive, and simple tasks which required little

judgment with little to no interaction with co-workers or the public. (R. 21.) At step four, the

ALJ found that Vanterpool had no past relevant work history. Finally, at step five, the ALJ

determined that Vanterpool had the capacity to perform other types of jobs that existed in

significant numbers in the national economy.

Because the ALJ's determinations at steps one, two, and four, do not negatively affect

Vanterpool's application for benefits, and because the Commissioner did not challenge these

conclusions, the Court will address in detail the ALJ's determinations only as to step three,

Vanterpool's residual functional capacity, and step five. The Court finds, however, based on a

review of the Administrative Record, that the ALJ's determinations at steps one, two, and four

are supported by substantial evidence.

---

[8] A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." Archambault v. Astrue, 09 Civ. 06363 (RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010) (citation omitted), rep. and rec. adopted by 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation and quotation marks omitted; alteration in original).

### A.  Step Three: Impairment List

At step three, the ALJ determined that Vanterpool's severe impairment did not meet the criteria for a *per se* disability as set forth in the applicable Social Security Regulations. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1; 20 C.F.R. §§ 416.920(d), 416.925, 416.926. First, the ALJ concluded that Vanterpool's paranoid schizophrenia did not satisfy the paragraph B requirements under section 12.04. To satisfy paragraph B, Vanterpool's impairment had to result in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.04(B).

Based on an examination of the consultative report of Dr. Bougakov and the state-assessment by Dr. Harding, the ALJ determined that Vanterpool's restrictions in daily living were only mild. (R. 19.) Dr. Bougakov's consultative report indicated that Vanterpool did all of his chores independently and used public transportation, and Dr. Harding's report noted only mild limitations in Vanterpool's daily living. (R. 19-20.)

The ALJ then found that Vanterpool's difficulties in social functioning were only moderate. The ALJ considered Vanterpool's good relationship with his family and his participation in sports. (R. 20.) Dr. Bougakov had also noted that Vanterpool was cooperative, related adequately, and had adequate eye contact. (R. 20.) The ALJ did, however, recognize that Vanterpool had a history of aggression, noting that the state assessment by Dr. Harding indicated that he may have moderate difficulty in responding to supervision. The ALJ also noted that Vanterpool was terminated from his Bronx Community College Program because of threatening behavior towards another student, though there was no other documentation of aggressive

behavior towards others. (R. 20.) The ALJ, therefore, concluded that a finding of "moderate limitations" in social functioning was appropriate. (R. 20.)

In addtion, the ALJ concluded that Vanterpool's difficulties in concentration, persistence and pace were moderate based on Dr. Bougakov's consultative report, Dr. Harding's state assessment, and Dr. Herneja's report. (R. 20.) Dr. Bougakov's report indicated that Vanterpool's attention and concentration were intact and his memory was only mildly impaired. (R. 20.) Dr. Bougakov concluded that Vanterpool had mild difficulties learning new tasks and performing complex tasks. (R. 20.) Dr. Harding's report also noted moderate limitations for concentration, persistence, and pace as well as for carrying out detailed tasks. Finally, the ALJ noted that Dr. Harneja's reports in 2010 and 2011 stated that Vanterpol was "easily distracted." (R. 20.) Accordingly, a finding of "moderate limitations" in concentration, persistence, and pace was "in keeping with the medical evidence." (R. 20.)

Finally, the ALJ noted that Vanterpool had experienced episodes of decompensation, specifically in 2007 and early 2008. (R. 20.) The contemporaneous treatment records and Dr. Bougakov's report, however, stated that the claimant was psychiatrically stable in 2010. (R. 20.) Because Vanterpool's impairments did not result in more than two areas of marked restriction or one area of marked restriction and repeated episodes of decompensation, Vanterpool did not satisfy the criteria of 12.04(B).

The ALJ also considered whether Vanterpool satisfied the criteria of paragraph C. Paragraph C requires

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) Repeated episodes of decompensation, each of extended duration; or (2) A residual disease process that

has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpt. P, App'x 1 at § 12.04(C). The ALJ noted that Vanterpool received only outpatient care since October 3, 2009, the onset date of his impairment. (R. 20.) Furthermore his "clinical signs" were "minimal over the course of his treatment." (R. 20.) Therefore, the "paragraph C" criteria were not met. Having failed to satisfy the "paragraph B" or "paragraph C" criteria, the ALJ concluded that Vanterpool did not have a listings-level impairment.

The Court finds that the ALJ's determination that Vanterpool's schizophrenia did not constitute a listings-level impairment applied the correct legal standard and is supported by substantial evidence. Vanterpool's GAF was consistently in the range indicating moderate but not severe impairments to his abilities. The contemporaneous treatment records indicate several times during the relevant period that Vanterpool was "clinically stable" and show that he was receiving marks of fair, adequate, intact, or normal in attention and concentration, mood, insight, judgment, impulse control, cognitive abilities, and memory. Furthermore, he consistently denied during his consultations with his treating physician and social worker any paranoia, side effects of his medication, or other difficulties.

**B.  Residual Functional Capacity**

Next the ALJ found that Vanterpool had the residual functional capacity to perform a full range of work at all exertional levels but that he had non-exertional limitations due to his paranoid schizophrenia. The ALJ found that Vanterpool was capable of doing routine, repetitive and simple tasks on a sustained basis with little or no interaction with co-workers or the public in

22

a job that required little judgment. (R. 21.) The ALJ cited substantial evidence in support of his determination of Vanterpool's RFC, including the contemporaneous treatment notes by the treating physician, notes by Vanterpool's social worker, examinations by a consulting physician, and Vanterpool's own testimony.

### 1.   Treating Physician Rule

The ALJ explicitly noted that two work-related mental assessments completed by Dr. Harneja in 2010 and 2011 "if accurate, would foreclose [Vanterpool] from all competitive employment." (R. 24.) In both the 2010 and 2011 work-related mental assessments, Dr. Harneja identified all of Vanterpool's work-related abilities as poor/none for the following: (1) relate to co-workers; (2) deal with the public; (3) interact with supervisors; (4) deal with work stresses; (5) function independently; and (6) follow complex job instructions. (R. 24, 244-45; 253-54.) His ability to perform detailed, but not complex job instructions, follow work rules, use judgment, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was fair. (R. 244-45; 253-54.) The only ability that changed between the 2010 and the 2011 assessments was Vanterpool's ability to maintain attention and concentration, improving from a 2010 assessment of poor/none to fair in 2011. (R. 244, 253.)

Furthermore, in a separate psychiatric assessment in April 2010, completed by Vanterpool's licensed clinical social worker and approved by Dr. Harneja, Vanterpool was described as experiencing unstable moods during which he was "easily agitated, argumentative, impulsive, [and] easily distracted with racing thoughts . . . ." (R. 242.) The social worker also noted that Vanterpool experienced auditory and visual hallucinations. (R. 242.) Though Vanterpool denied having any hallucinations, the assessment indicated that he appeared as if he

23

was responding to internal stimuli and was observed laughing inappropriately. (R. 242.) The March 2011 psychiatric assessment reports nearly the same findings as the 2010 assessment. (R. 250-51.) The ALJ, however, gave these work-related mental and psychiatric assessments "little weight." (R. 24.)

Under the treating physician rule, the ALJ was required to give the medical opinion of Vanterpool's treating physician, Dr. Harneja, "controlling weight" on whether or not Vanterpool's impairments prevented him from being able to engage in substantial gainful activity if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted) (alteration in original). In this circuit, the rule is robust. The ALJ cannot discount a treating physician's opinion unless the ALJ believes that it "lack[s] support or [is] internally inconsistent." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). See also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 327 (S.D.N.Y. 2010) (finding the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule was not appropriate). Furthermore, a report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

24

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c)(2)-(6). This process must also be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. <u>Snell</u>, 177 F.3d at 134.

The ALJ in this case complied with the treating physician rule and satisfactorily explained the reasons for his decision to afford less than controlling weight to Dr. Harneja's opinion. Substantial evidence supports this determination. The ALJ supported his decision, in part, with evidence of inconsistency between Dr. Harneja's reports and the contemporaneous treatment records. The ALJ emphasized that the 2010 and 2011 work-related mental and psychiatric assessments did not accurately reflect the physician's findings in the contemporaneous treatment records. The ALJ also noted that "[g]iven the contemporaneous nature of the treatment entries, the undersigned finds them more reliable than the assessments." (R. 24.) The treatment records consistently indicated that Vanterpool had normal mental status examinations and informed Dr. Harneja and his social worker that he had no complaints. Concluding that it was "difficult, if not impossible" to reconcile Dr. Harneja's 2010 assessment with the contemporaneous treatment records from that same period, the ALJ accorded Dr.

25

Harneja's 2010 report little weight. (Id.) The same is true for Dr. Harneja's 2011 report, which was nearly identical to the 2010 report. "In light of the absence of positive clinical signs documented in the above treatment records and the steady trend of progress apparent by those same records, . . . the undersigned declines to accord Dr. Harneja's assessment of [Vanterpool's] mental limitations much weight." (Id.) Because the treatment records from 2009-2010 showed that Vanterpool was consistently clinically stable, had a GAF of 55-62, and made no complaints to his treating physician or social worker, the ALJ concluded that "the record sufficiently shows that the claimant can do unskilled tasks in a job that requires little judgment and little to no contact with the public or with co-workers." (R. 25.)

The Court finds no error in the ALJ's conclusion that the conflict between the contemporaneous treatment notes and the medical opinion of the treating physician as to residual functional capacity warranted that little weight be given to Dr. Harenja's opinion. As noted above, while Dr. Harneja's 2010 and 2011 reports indicate that Vanterpool had little to no ability to function in the workplace, the contemporaneous treatment records indicate that Vanterpool should be clinically stable if he continued with his treatment. Many of the treatment records indicate that Vanterpool's cognitive ability, memory, mood, and concentration were normal. On October 22, 2009, Vanterpool's progress note from Bronx-Lebanon Hospital Center indicated that his cognitive ability and memory were intact, his mood was appropriate, he had no thought/perceptual disorder, and his judgment, insight, and impulse control were fair. The exact same indications were made in November 20, 2009. Though the treatment records in October 2009 and November 2009 contain a blank next to the observation that Vanterpool's attention and concentration were normal, suggesting that they were not normal, the January 2010, February 2010, March 2010, and October 2010 progress reports indicate that Vanterpool had no thought or

26

perceptual disorder, his attitude and behavior were appropriate, his cognitive abilities and memory were intact, and his attention and concentration were normal. His GAFs were consistently between 60-63 during this period, indicating that Vanterpool was functioning "pretty well" or with moderate difficulty. The contemporaneous treatment notes support the ALJ's determination that the 2010 and 2011 assessments were inconsistent with the treatment record.

While an ALJ "may not reject a treating physician's opinion based 'solely' on internal conflicts in that physician's clinical findings," Lamond v. Astrue, 440 F. App'x 17, 21 (2d Cir. Oct. 7, 2011) (citation omitted), the ALJ also found Dr. Harneja's opinion to be inconsistent with the findings of Dr. Bougakov, the consultative physician. Dr. Bougakov's report was more consistent with the treatment records. During the consultation with Dr. Bougakov, Vanterpool denied any psychiatric symptoms. He was cooperative, related in an adequate fashion, and maintained appropriate eye contact. His attention and concentration were intact and his memory skills were only mildly impaired. The only clinical indications were average to below average cognitive functioning, limited general fund of information, poor to fair insight, and fair judgment. Dr. Bougakov noted that Vanterpool reported doing most of his daily chores by himself. While he did not spend much time with friends, he had a good relationship to his family. Vanterpool was able to manage money and take public transportation. Dr. Bougakov stated that Vanterpool did not "really present with significant vocational difficulties, with the exception of some mild difficulties learning new tasks and performing complex tasks." (R. 221.) The results of the examination were "consistent with psychiatric problems" but "did not appear to be significant enough to interfere with [Vanterpool's] ability to function on a daily basis." (R. 221.)

Because the ALJ found this opinion to be consistent with the treatment records, he "accord[ed] Dr. Bougaov's opinion significant weight." (R. 25.) The opinions of consultative

27

physicians may override those of a treating physician if they are supported by substantial evidence in the record. Jones v. Shalala, 900 F. Supp. 663, 669 (S.D.N.Y. 1995). Given the evidence in the contemporaneous treatment records that Vanterpool had some mild to moderate impairments, but reported no delusions or hallucinations, and was observed to have normal cognitive abilities, an intact-memory, and normal concentration and attention, the ALJ's determination to give Dr. Bougakov's opinion significant weight is supported by substantial evidence.

As long as the ALJ was able to weigh the evidence and make a determination as to disability, the inconsistency between the 2010 and 2011 reports and the contemporaneous treatment records did not require him to contact the treating physician for a clarification. An ALJ is under a duty to develop the record, regardless of whether the claimant is represented by counsel. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). Nonetheless, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (finding that where a record is *deficient* or *inadequate*, the ALJ has a duty to seek additional information from the treating physician).

Here, the ALJ's reasons for affording "little weight" to Dr. Harneja's opinion are not based on an incomplete record. Rather, the ALJ compared Dr. Harneja's 2010 and 2011 reports with the physician's own treatment records and concluded that they were incompatible. See 20 C.F.R. § 416.927(c)(2) (ALJ need not give controlling weight to the treating source's opinion where is it not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and where it is "inconsistent with the other substantial evidence in [the] record."). Because the ALJ did not reject Dr. Harneja's opinion due to gaps in the record, he was not

required to contact the physician for further information or clarification. <u>See also</u>, <u>Micheli v. Astrue</u>, 501 F. App'x 26, 29-30 (2d Cir. Oct. 25, 2012) ("The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician."); <u>Brown v. Commissioner of Social Security</u>, 13 Civ. 0827 (JMF)(GWG), 2014 WL 783565, at *17-18 (S.D.N.Y. Feb. 28, 2014) (finding that the ALJ fulfilled his duty to develop the record without further contact with the treating physician upon a determination that the physician's opinion was inconsistent with the other evidence in the record).

Given this evidence, the Court concludes that the ALJ's determination as to the weight of Dr. Harneja's report and that of Dr. Bougakov does not constitute legal error.  <u>See e.g.</u>, <u>Zokaitis v. Soc. Sec. Admin.</u>, 465 F. App'x 17, *19 (2d Cir. 2012) (finding no error in Commissioner's decision to give little weight to the opinions of a treating nurse and social worker when those opinions were inconsistent with the progress notes, including a GAF score showing only moderate difficulty in functioning); <u>Lamond</u>, 440 F. App'x at 20-21 (finding that the ALJ properly determined that the treating physician's opinion was due less than controlling weight because it was inconsistent with the treatment notes and other medical evidence in the record); <u>Montaldo v. Astrue</u>, 10 Civ. 6163 (SHS), 2012 WL 893186, at *15 (S.D.N.Y. Mar. 15, 2012) (finding that the ALJ's determination that the treating physician's responses to a questionnaire were inconsistent with her own evaluations of the plaintiff's day-to-day activities was one of several "good reasons" for not giving the opinion controlling weight).

Even if Dr. Harneja's medical opinion, though not controlling, was supported by substantial evidence, based on a review of the entire record, there is also substantial evidence to support the ALJ's position on Vanterpool's RFC. Therefore, the ALJ's determination should stand. <u>Brault</u>, 683 F.3d at 448 (finding that "[t]he substantial evidence standard means once an

ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise"* (citation and internal quotation marks omitted; emphasis in original)).

### 2. Vanterpool's Testimony and Credibility

In determining Vanterpool's RFC, the ALJ also considered Vanterpool's subjective allegations of pain or other symptoms. The ALJ noted in his decision that Vanterpool stated that he was "disabled due to schizophrenia, paranoia, and a mental disability." (R. 21.) The ALJ also noted that Vanterpool stated that he did not work due to paranoia and that he needed help with his personal needs, had difficulty concentrating, was confused, had no hobbies or other interests, and could not function. According to Social Security Administration Regulations, an individual's subjective complaints alone should not be conclusive evidence of disability. 20 C.F.R. § 416.929(b). If a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ will consider other evidence, including factors such as the claimant's daily activities, the nature, extent, and duration of her symptoms, precipitating and aggravating factors, and the treatment provided. 20 C.F.R. § 416.929(c)(3).

A credibility finding by an ALJ is entitled to deference by a reviewing court and will be set aside only if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded [to] the ALJ's [credibility] determination because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor.").

The ALJ followed the two-step process in considering Vanterpool's symptoms: (1) determining if there was an underlying medically determinable mental impairment that could reasonably be expected to produce Vanterpool's symptoms; and (2) evaluating "the intensity,

persistence, and limiting effects" to determine the extent of functional limitation. (R. 21.) Ultimately, the ALJ concluded that Vanterpool's paranoid schizophrenia could reasonably be expected to cause his symptoms, but Vanterpool's statements about the symptom's intensity, persistence, and limiting effects was not credible in light of his medical record.

While the ALJ used disapproved "boiler plate" language rejecting Vanterpool's statements as incredible because "they are inconsistent with the above residual functional capacity assessment,"[9] the ALJ did not rely solely on this justification for his credibility findings. The ALJ explained the parts of the record that contradicted Vanterpool's assertions regarding the intensity and severity of his impairments, stating that "the psychiatric treatment records show that once treatment – Seroquel and therapy – was underway, the claimant's mental status improved dramatically." (R. 21.) Furthermore, all of Vanterpool's mental status examinations, "with rare exception," were "normal." (R. 21.) The ALJ also pointed to Vanterpool's consistent GAF, which ranged from 55-60. Perhaps most significantly, the ALJ pointed to other statements in the record made by Vanterpool in which he denied paranoia and hallucinations. Vanterpool consistently told his physician and his social worker that he was doing fine and at one point

---

[9] The Seventh Circuit found this language to be inconsistent with SSR 96-7p, which explains that the "adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence." See Bjornson v. Astrue, 671 F.3d 640, 645-46 (7th Cir. 2012). The court must specifically consider the statements in the light of the rest of the objective record of evidence. See Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *16 (S.D.N.Y. July 2, 2013) rep. and rec. adopted by 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014). To dismiss a claimant's testimony based on its incompatibility was an RFC "gets things backwards" because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson, 671 F.3d at 645. See also Cruz, 2013 WL 3333040, at *16 ("The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his symptoms are discarded if they are not compatible with an RFC that has been predetermined based on other factors.")

indicated that he was looking for work. Therefore, though the ALJ improperly stated that Vanterpool's testimony regarding his symptoms was incredible because it was not consistent with the RFC, his further analysis regarding the rest of the medical evidence and other statements made by Vanterpool are sufficient to satisfy SSR 96-7p's requirement that the ALJ carefully consider the rest of the record when making a credibility determination. See e.g., Marquez v. Colvin, 12 Civ. 6819 (PKC), 2013 WL 5568718, at *15 (S.D.N.Y. Oct. 9, 2013) ("[T]he ALJ did not merely point to the conclusions of his own RFC assessment to support his credibility determination. Rather, he stated his conclusion after an exhaustive review of plaintiff's medical records and testimony."); Brown, 2014 WL 783565, at *20 (finding ALJ's credibility determination satisfactory even though the ALJ used the language "to the extent they are inconsistent with the above residual functional capacity assessment"). Substantial evidence supported the ALJ's credibility determination.

Accordingly, the Court concludes that the ALJ's RFC determination did not violate the treating physician's rule or improperly disregard Vanterpool's testimony regarding his symptoms. The ALJ issued a decision reflecting a detailed evaluation of the opinions of Vanterpool's treating physician and the consultative physician in light of the entire medical record, and explicitly considered Vanterpool's testimony regarding his subjective symptoms. The Court finds the ALJ's residual functional capacity determination to be without legal error and supported by substantial evidence.

### C.  Step Five: Other Work

Having found that Vanterpool had no past relevant work that was also substantial and gainful, the burden of proof shifted to the Commissioner to establish that suitable work, which Vanterpool could perform, existed in significant numbers. At step five, based on Vanterpool's

RFC, age, education, and work experience, the ALJ found that "there are jobs that exist in the significant numbers in the national economy" that Vanterpool could perform given his non-exertional limitations. (R. 25.)

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable [M]edical [V]ocational guidelines." Rosa, 168 F.3d at 78 (citation and internal quotation marks omitted). Those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." Id. (citation and internal quotation marks omitted). If, however, a claimant has non-exertional limitations (which are not accounted for in the Grids) that "significantly limit the range of work permitted by his exertional limitations then the [G]rids obviously will not accurately determine disability status . . . ." Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (citation and internal quotation marks omitted). In such cases, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at 603). A "significant" non-exertional limitation is one that results in "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606.

The Commissioner met her burden to establish that suitable work, which Vanterpool could perform, existed in significant numbers. The ALJ found that Vanterpool's ability to perform work had been compromised by nonexertional limitations. Vanterpool, however, was "capable of making a successful adjustment to other work that exists in significant numbers in

the national economy." (R. 35.)  In arriving at his conclusion, the ALJ relied on the testimony of a vocational expert who was present at Vanterpool's hearing.

An ALJ is entitled to credit the testimony of a vocational expert. Bavaro v. Astrue, 413 F. App'x 382, 384 (2d Cir. Mar. 14, 2011) (refusing to disturb an ALJ's finding as to the availability of jobs at the national and regional level based on proclamations of a decline in the particular industry). A vocational expert's "recognized expertise provides the necessary foundation for his or her testimony." Decker v. Astrue, 11 Civ. 5593 (PGG)(GWG), 2013 WL 1694665, at *12 (S.D.N.Y. Apr. 19, 2013) rep. and rec. adopted by 2013 WL 4804197 (S.D.N.Y. Sept. 9, 2013) (citation and quotation marks omitted).

At the hearing, the ALJ carefully introduced each of the potential limitations affecting Vanterpool: (1) a simple, repetitive, routine job; (2) little to no interaction with coworkers; (3) limited or no interaction with the public; (4) little judgment; (5) off task ten percent of the time; (6) off task 20 percent of the time; and (7) paranoia. Even when considering all of the limitations together, except for being off task and having paranoia, the vocational expert was able to identify three light-exertional jobs available in significant numbers in the national and regional economies.

While the vocational expert testified that being "off task" ten percent of the time would leave only the job of courier available (R. 62), and being "off task" 20 percent of the time or having daily paranoia would prohibit an individual from performing any of the identified occupations, the ALJ did not include these restrictions in Vanterpool's RFC. The ALJ noted that Vanterpool's attention and concentration were usually "normal on examination," and Vanterpool consistently denied any paranoia or hallucinations. (R. 23.) Given the ALJ's reliance on the

34

testimony of a vocational expert and the use of the same limitations described in the RFC, the

ALJ's determination at step five is supported by substantial evidence.

## CONCLUSION

Based on the evidence in the administrative record, the ALJ had substantial evidence to

conclude that Vanterpool was not "disabled" as that term is defined in the Social Security Act

and regulations because he did not have a Listing-level disability and was able to perform work

that took into account his specific impairments. Accordingly, I recommend that the

Commissioner's motion for judgment on the pleadings be GRANTED in its entirety. I further

recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its

order would not be taken in good faith and, therefore, that *in forma pauperis* status be denied for

the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).


\*                    \*                    \*


## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation

to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another

party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Valerie E. Caproni at the Thurgood Marshall Courthouse, 40 Foley

Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must

be addressed to Judge Caproni. The failure to file these timely objections will result in a waiver

of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:        New York, New York
              April 22, 2014


cc:           Ephraim Vanterpool (*By Chambers*)
              30 Richman Plz
              Apt 4K
              Bronx, NY 10453